UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

JOSEPH A. SULLIVAN,                     :
                                        :
            Plaintiff                   :        No. 3:11-CV-02369
                                        :
      vs.                               :        (Judge Nealon)
                                        :
CAROLYN W. COLVIN, ACTING               :
COMMISSIONER OF SOCIAL                  :        **FILED**
SECURITY,                               :        SCRANTON
                                        :
            Defendant                   :        SEP 2 4 2013

                        MEMORANDUM                PER _____
                                                  DEPUTY CLERK

## Background

The above-captioned action is one seeking review of a
decision of the Commissioner of Social Security ("Commissioner")
denying Plaintiff Joseph A. Sullivan's claim for social security
disability insurance benefits and supplemental security income
benefits.

Sullivan protectively filed[1] an application for
supplemental security income benefits on November 14, 2008, and an
application for disability insurance benefits on January 26, 2009.
Tr. 18, 81-82, 136-149 and 162.[2]  On April 15, 2009, the Bureau of

---

1.  Protective filing is a term for the first time an individual
contacts the Social Security Administration to file a claim for
benefits.  A protective filing date allows an individual to have
an earlier application date than the date the application is
actually signed.

2.  References to "Tr.__" are to pages of the administrative
record filed by the Defendant as part of the Answer on April 10,
2012.

Disability Determination[3] denied Sullivan's applications. Tr. 84-92. On April 17, 2009, Sullivan requested a hearing before an administrative law judge. Tr. 93-94. After over 12 months had passed, an administrative hearing was held on April 19, 2010. Tr. 34-79. On May 17, 2010, the administrative law judge issued a decision denying Sullivan's applications. Tr. 18-29. On June 7, 2010, Sullivan requested that the Appeals Council review the administrative law judge's decision. Tr. 11-12 and 14. After over 17 months had passed, the Appeals Council on November 14, 2011, concluded that there was no basis upon which to grant Sullivan's request for review. Tr. 1-6. Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

Sullivan then filed a complaint in this court on December 22, 2011. Supporting and opposing briefs were submitted and the appeal[4] became ripe for disposition on July 31, 2012, when Sullivan filed a reply brief.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being

---

3. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits and supplemental security income benefits on behalf of the Social Security Administration. Tr. 84 and 88.

4. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D.Pa. Local Rule 83.40.1.

insured is commonly referred to as the "date last insured." It is undisputed that Sullivan met the insured status requirements of the Social Security Act through December 31, 2012. Tr. 18, 20 and 162.

Supplemental security income (SSI) is a federal income supplement program funded by general tax revenues (not social security taxes). It is designed to help aged, blind or other disabled individuals who have little or no income.

Sullivan was born in the United States on July 24, 1984, and at all times relevant to this matter was considered a "younger individual"[5] whose age would not seriously impact his ability to adjust to other work. 20 C.F.R. §§ 404.1563(c) and 416.963(c). Tr. 136.

Sullivan graduated from Governor Livingston High School, Berkeley Heights, New Jersey, in June, 2003, and can, read, write, speak and understand the English language and perform basic mathematical functions such as counting change, handling a savings account and using a checkbook and money orders. Tr. 165-166, 172, 194, 203 and 259. Except for one C in 11th grade in a course entitled "Introduction to TV" Sullivan had all A's and B's during high school. Tr. 259. In 9th grade Sullivan had an A average in English 1 and a B+ average in Geometry; in 10th grade he had a B+

---

5. The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).

average in English 2 and a B+ average in Algebra 2; in 11th grade a B average in English 3 Honors and a B average in Math Analysis; and in 12th grade a B+ average in English 4 Honors and an A average in Physics. Tr. 259. Sullivan reported that he did not get any special education help in high school but that in "grammar and middle school" he had "speech therapy." Tr. 172. Sullivan played football during his sophomore through senior years of high school. Tr. 41. After graduating from high school, Sullivan enrolled in college but withdrew after attending for one week. Tr. 42.

Sullivan has past relevant employment[6] as (1) a bank teller which was described as skilled, light work by a vocational expert, (2) a cashier which was described as semi-skilled, light work, and (3) a mail clerk which was described as unskilled, light work.[7] Tr. 72. The vocational expert noted that all of these

---

6. Past relevant employment in the present case means work performed by Sullivan during the 15 years prior to the date his claim for disability was adjudicated by the Commissioner. 20 C.F.R. §§ 404.1560 and 404.1565.

7. The terms sedentary, light, medium and heavy work are defined in the regulations of the Social Security Administration as follows:

> (a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are
> (continued...)

4

positions require more than occasional interaction with other individuals. Tr. 27 and 73.

In documents filed with the Social Security Administration, Sullivan indicated that he worked as a cashier for a supermarket from May, 2001, to August, 2003, a period of well-over two years; as a mail sorter from August, 2004, to January, 2005, and from March, 2005, to June, 2005; and as a bank teller for Sovereign Bank from August, 2005, to September, 2007, a period

---

7.  (...continued)
    met.

    (b) *Light work.* Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

    (c) *Medium work.* Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can do sedentary and light work.

    (d) *Heavy work.* Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

20 C.F.R. §§ 404.1567 and 416.967.

of two years. Tr. 175 and 231. Sullivan reported that with respect to the teller position for Sovereign Bank and the mail sorter positions he worked 7 hours per day, 5 days per week and with respect to the cashier position for the supermarket he worked 3 hours per day, 4 days per week. Tr. 176 and 184. Sullivan also reported that he had full-time teller positions for banks in October and November, 2007, and for credit unions from December, 2007, to January, 2008, and from August, 2008, to October 2008. Tr. 175 and 179-183. In all of these positions, Sullivan had more than occasional contact with other individuals, including members of the public, co-workers and supervisors. Tr. 27, 176-185 and 230-232.

Records of the Social Security Administration reveal that Sullivan had earnings in the years 2000 through 2008 as follows:

| | |
|---|---|
| 2000 | $ 1946.89 |
| 2001 | 3236.27 |
| 2002 | 6232.01 |
| 2003 | 6550.98 |
| 2004 | 7913.74 |
| 2005 | 13258.81 |
| 2006 | 20911.25 |
| 2007 | 20117.33 |
| 2008 | 5188.26 |

Tr. 157. Sullivan's total reported earnings were $85,355.54. Id.

Sullivan claims that he became disabled on October 2, 2008,[8] because of mental impairments. Tr. 39. He does not allege that he suffers from physical impairments. Id. The mental conditions which he contends prevent him from engaging in gainful employment are Asperger syndrome, anxiety and depression. Id.

The website for the National Institute of Neurological Disorders and Stroke describes Asperger's Syndrome as follows:

> Asperger syndrome (AS) is an autism spectrum disorder (ASD), one of a distinct group of complex neurodevelopment disorders characterized by social impairment, communication difficulties, and restrictive, repetitive, and stereotyped patterns of behavior. Other ASDs include autistic disorder . . . ASDs are considered neurodevelopmental disorders and are present from infancy or early childhood. Although early diagnosis using standardized screening by 2 is the goal, many with ASD are not detected until later because of limited social demands and support from parents and caregivers in early life.
>
> The severity of communication and behavioral deficits, and the degree of disability, is variable in those affected by ASD. Some individuals with ASD are severely disabled and require very substantial support for basic activities of daily living. Asperger syndrome is considered by many to be the mildest form of ASD and is synonymous with the most highly functioning individuals with ASD.
>
> \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*
>
> Studies of children with Asperger syndrome suggest that their problems with socialization and communication continue into adulthood.
>
> \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

---

8. Sullivan was 24 years of age on the alleged disability onset date.

Children with Asperger syndrome may have speech marked by a lack of rhythm, an odd inflection, or a monotone pitch. They often lack the ability to modulate the volume of their voice to match their surroundings. For example, they may have to be reminded to talk softly every time they enter a library or a movie theatre.

Unlike the severe withdrawal from the rest of the world that is characteristic of autism, children with Asperger syndrome are isolated because of their poor social skills and narrow interests. Children with the disorder will gather enormous amounts of factual information about their favorite subject and will talk incessantly about it, but the conversation may seem like a random collection of facts or statistics, with no point or conclusion. They may approach other people, but make normal conversation difficult by eccentric behaviors or by wanting only to talk about their singular interest.

Many children with AS are highly active in early childhood, but some may not reach milestones as early as other children regarding motor skills such as pedaling a bike, catching a ball, or climbing outdoor play equipment. They are often awkward and poorly coordinated with a walk that can appear either stilted or bouncy.

Some children with AS may develop anxiety or depression in young adulthood. Other conditions that often co-exist with Asperger syndrome are Attention Deficit Hyperactivity Disorder (ADHD), tic disorders (such as Tourette syndrome), depression, anxiety disorders, and Obsessive Compulsive Disorder (OCD).

Asperger Syndrome Fact Sheet, National Institute of Neurological Disorders and Stroke, National Institute of Health, http://www.ninds.nih.gov/disorders/asperger/detail_asperger.htm#230233080 (Last accessed September 19, 2013). A child with Asperger syndrome generally has no clinically significant delays in language or cognitive development, or in developing age-appropriate self-help skills. See Asperger's Snydrome, Symptoms, Mayo Clinic, Mayo Clinic staff, http://www.mayoclinic.com

/health/aspergers-syndrome/DS00551/DSECTION=symptoms (Last accessed September 19, 2013). The impact of the syndrome is primarily on social interaction. Id.

Although Sullivan contends he became disabled on October 2, 2008. Sullivan stated in a document filed with the Social Security Administration that he stopped working on November 3, 2008. Tr. 167. His last position was for SMX Corporation in Carlisle, Pennsylvania, and he only earned $126.00. Tr. 49, 161 and 230. Sullivan reported that at SMX Corp he scanned packages and loaded trucks. Tr. 230. Sullivan alleged that he resigned that job because of anxiety and his mental condition. Tr. 49 and 167. Sullivan has not worked since November, 2008. Id.

For the reasons set forth below, the Court will affirm the decision of the Commissioner denying Sullivan's applications for disability insurance benefits and supplemental security income benefits.

**Standard of Review**

When considering a social security appeal, the Court has plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, the Court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial

evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir.
1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).
Factual findings which are supported by substantial evidence must
be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34,
38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported
by substantial evidence, we are bound by those findings, even if
we would have decided the factual inquiry differently."); Cotter
v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by
the Secretary must be accepted as conclusive by a reviewing court
if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d
1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th
Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11
(11th Cir. 1990).

        Substantial evidence "does not mean a large or
considerable amount of evidence, but 'rather such relevant
evidence as a reasonable mind might accept as adequate to support
a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565
(1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197,
229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d
198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d
Cir. 1999). Substantial evidence has been described as more than
a mere scintilla of evidence but less than a preponderance.
Brown, 845 F.2d at 1213. In an adequately developed factual
record substantial evidence may be "something less than the weight
of the evidence, and the possibility of drawing two inconsistent

                                10

conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

## Sequential Evaluation Process

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous

11

period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A).

Furthermore,

> [a]n individual shall be determined to be under a
> disability only if his physical or mental impairment
> or impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work experience,
> engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of
> whether such work exists in the immediate area in which
> he lives, or whether a specific job vacancy exists for
> him, or whether he would be hired if he applied for
> work. For purposes of the preceding sentence (with
> respect to any individual), "work which exists in the
> national economy" means work which exists in significant
> numbers either in the region where such individual
> lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in
evaluating disability insurance and supplemental security income
claims. See 20 C.F.R. §404.1520 and 20 C.F.R. § 416.920; Poulos,
474 F.3d at 91-92. This process requires the Commissioner to
consider, in sequence, whether a claimant (1) is engaging in
substantial gainful activity,[9] (2) has an impairment that is
severe or a combination of impairments that is severe,[10] (3) has

---

9. If the claimant is engaging in substantial gainful activity,
the claimant is not disabled and the sequential evaluation
proceeds no further. Substantial gainful activity is work that
"involves doing significant and productive physical or mental
duties" and "is done (or intended) for pay or profit." 20 C.F.R.
§ 404.1510 and 20 C.F.R. § 416.910.

10. The determination of whether a claimant has any severe
(continued...)

an impairment or combination of impairments that meets or equals

the requirements of a listed impairment,[11] (4) has the residual

functional capacity to return to his or her past work and (5) if

not, whether he or she can perform other work in the national

---

10.   (...continued)
impairments, at step two of the sequential evaluation process, is
a threshold test. 20 C.F.R. §§ 404.1520(c) and 416.920(c). If a
claimant has no impairment or combination of impairments which
significantly limits the claimant's physical or mental abilities
to perform basic work activities, the claimant is "not disabled"
and the evaluation process ends at step two.  Id.  If a claimant
has any severe impairments, the evaluation process continues.  20
C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g). Furthermore, all
medically determinable impairments, severe and non-severe, are
considered in the subsequent steps of the sequential evaluation
process.   20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and
416.945(a)(2). An impairment significantly limits a claimant's
physical or mental abilities when its effect on the claimant to
perform basic work activities is more than slight or minimal.
Basic work activities include the ability to walk, stand, sit,
lift, carry, push, pull, reach, climb, crawl, and handle. 20
C.F.R. § 404.1545(b).  An individual's basic mental or non-
exertional abilities include the ability to understand, carry out
and remember simple instructions, and respond appropriately to
supervision, coworkers and work pressures. 20 C.F.R. § 1545(c).

11.   If the claimant has an impairment or combination of
impairments that meets or equals a listed impairment, the
claimant is disabled. If the claimant does not have an impairment
or combination of impairments that meets or equals a listed
impairment, the sequential evaluation process proceeds to the
next step. 20 C.F.R. § 404.1525 explains that the listing of
impairments "describes for each of the major body systems
impairments that [are] consider[ed] to be severe enough to
prevent an individual from doing any gainful activity, regardless
of his or her age, education, or work experience."  Section
404.1525 also explains that if an impairment does not meet or
medically equal the criteria of a listing an applicant for
benefits may still be found disabled at a later step in the
sequential evaluation process.

economy. _Id_. As part of step four the administrative law judge must determine the claimant's residual functional capacity. _Id_.[12]

Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. _See_ Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. _Id_; 20 C.F.R. §§ 404.1545 and 416.945; _Hartranft_, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**Medical Records and Other Evidence**

The administrative record in this case is 378 pages in length and the Court has thoroughly reviewed that record. Before the Court addresses the administrative law judge's decision and the arguments of counsel, the medical records will be reviewed in detail. The relevant time period for review of medical records is generally the alleged disability onset date to the date the

---

12. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

14

administrative law judge issued his or her decision and the Court's task is to focus on the records before the administrative law judge. However, in this case, one of the mental impairments which Sullivan contends prevents him from engaging in work developed during his childhood. Consequently, it is appropriate to consider records that predate the alleged disability onset date of October 2, 2008.

The first record that the Court encounters is a neurodevelopment reevaluation of Sullivan from October, 1996,[13] by Joseph A. Holahan, M.D., Chief, Developmental Pediatric Section, St. Joseph's Hospital and Medical Center, Paterson, New Jersey. Tr. 337-339. Dr. Holahan's report reveals that Sullivan was in the 6th grade, was receiving speech and language therapy two times per week, reading instruction each morning and therapy regarding social decision making once per week. Tr. 337. According to the report, Sullivan had one good friend in school and tended to be immature and "still weak with more complex social skills." Id. Sullivan was taking the drug Ritalin because of problems with hyperactivity and attention. Id. Dr. Holahan's assessment was that Sullivan had "mild, neurologically based learning weaknesses, with an associated Attention Deficit Disorder" but that "[h]is ADD

---

13. The report is dated October 22, 1986, which is obviously a typographical error because according to the report at the time of the "reevaluation" Sullivan was 12 years and 3 months of age. Tr. 337.

symptoms have improved satisfactorily with Ritalin[.}" Tr. 339.
However, it was further stated that "indications are he needs
better coverage in the later morning and the morning dose [of
Ritalin would] be raised to 15 mg and the afternoon dose continued
the same." Id. Dr. Holahan concluded the report by stating "[a]ll
in all, Joseph is doing well, there is steady progress and I am
optimistic regarding continued progress." Id.

On December 10, 1997, Sullivan was again examined by Dr.
Holahan. Tr. 335-336. At that appointment, Sullivan was
accompanied by both of his parents and the principal concern was
Sullivan's anxiety level and tendency to obsess excessively. Tr.
335. It was stated that Sullivan was "enrolled in a regular 7th
grade class in the Middle School" and that his grades were good,
mostly A's and B's, and his health was good. Id. Sullivan's
prescription for Ritalin had been discontinued in October, 1997,
and "there [had] not been a deterioration in his ability to focus
or a decrease in the anxiety level." Id. During the examination,
Dr. Holahan observed that Sullivan had mild stiffness in his
social interactions, his eye contact was appropriate 90% of the
time, and "there was a strong tendency to perseverate on topics of
high interest and to ask many questions for reassurance and to
continue to ask the questions even with reassurance." Id. Dr.
Holahan stated in the concluding paragraph of the report of this
appointment that Sullivan had a "mild, static neurological

16

impairment" and "Asperger characteristics." Tr. 336. Dr. Holahan further stated that "[f]rom a functional point of view, obsessive compulsive features and a high anxiety level are [Sullivan's] most problematic behaviors . . . and are interfering the most with his functioning." Id. Dr. Holahan prescribed the drug Paxil 20 mg each morning and scheduled a follow-up appointment in two months. Id.

At an appointment with Dr. Holahan on February 10, 1998, Sullivan was accompanied by his parents who noted that there had been an improvement with the Paxil in his level of anxiety and his tendency to obsess and that Sullivan had no significant side effects from that medication. Tr. 333. After conducting a clinical interview and examining Sullivan, Dr. Holahan's assessment was that Sullivan showed an improvement in his obsessive compulsive symptoms and his level of anxiety but that those conditions still persisted to a moderate degree. Tr. 334. Dr. Holahan increased Sullivan's dosage of Paxil from 20 mg each morning to 30 mg. Id.

On May 14, 1998, Sullivan had a follow-up appointment with Dr. Holahan, accompanied by his parents, at which it was reported that Sullivan was "doing very well." Tr. 331. Sullivan was "calmer, less worried and obsessing less" and "[h]is self-confidence [was] better." Id. Dr. Holahan continued Sullivan's current medications and his only recommendation was that his

17

parents speak to Dr. Boyle, another treating physician, and with officials at the school regarding working on Sullivan's social skills in dealing with teenage peers. Tr. 331-332.

Sullivan had appointments with Dr. Holahan on March 16, 1999, October 10, 2000, and February 14 and August 8, 2002.

At the appointment on March 16, 1999, Sullivan's parents reported that he was enrolled in the 8th grade and doing very well academically "with grades primarily A's and B's." Tr. 328. The parents further indicated that Sullivan's "overall functioning and social involvement is the best that it has been" and he was involved in wrestling "this year and did quite well." Id. Dr. Holahan's assessment was as follows: "Joe is a 14 year, 8 month old boy with mild, neurological impairment, manifesting mild Asperger symptomatology. He has shown a very steady rate of progress and improvement in all areas. He is doing well academically. There are continued gains socially. An underlying degree of anxiety and obsessive/compulsive characteristics are present, but have definitely improved with the Paxil[.]" Tr. 329.

At the appointment on October 10, 2000, it was reported that Sullivan was attending the 9th grade and doing well academically and playing football. Tr. 326. After conducting a clinical interview and examining Sullivan, Dr. Holahan's assessment was essentially the same as the assessment made on March 16, 1999. Tr. 327.

At the appointment on February 14, 2002, Sullivan's father reported as follows: "Joe is 'very rigid' and self-centered'. He can be 'narrow-minded'. He has only one or two friends' and does not have a girlfriend . . . Although he does not go out too much, he is going to a youth group on Tuesdays and lately has been going to watch some of the basketball games." Tr. 324. It was also reported that Sullivan joined a gym, was playing football, planned to "run track" and was working as a cashier in order to save money to buy a car. Id. Dr. Holahan's assessment was similar to the one made on October 10, 2000. Tr. 325. Dr. Holahan, however, did note that Sullivan had obsessive compulsive characteristics. Id.

During the appointment with Dr. Holahan on August 8, 2002, Sullivan tended to be impulsive and quickly became angry with his parents over minor issues. Tr. 322. Dr. Holahan noted that Sullivan "tends to argue quite a bit and has a 'reason' as to why he feels he is right" and "[h]e uses complex language, but there is awkwardness in his style of interacting." Id. Dr. Holahan's assessment was that Sullivan was "an 18 year old boy with Asperger Syndrome" with obsessive compulsive characteristics and underlying anxiety. Tr. 323. Dr. Holahan further stated that Sullivan tends to be impulsive, overreacts at times and sees things only from his perspective. Id. No further reports from Dr. Holahan were contained in the administrative record.

The next medical record encountered is a discharge report of a hospitalization Sullivan had at Overlook Hospital, Summit, New Jersey, from October 31 through November 6, 2003. Tr. 378. Sullivan was admitted to the psychiatric unit because of "mood instability and depression as well as anxiety." Tr. 378. He was treated with the psychotropic drugs Serzone, Seroquel, Haldol and Ativan and the sleep aid Ambien. Id. Sullivan's mood, affect and behavior improved and he was discharged in a stable psychiatric and medical condition. Id. The discharge diagnosis was major depression, recurrent without psychotic features, generalized anxiety disorder and Asperger Syndrome by history. Id. His Global Assessment of Functioning (GAF) score at discharge was 50.[14] Id.

---

14. The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 3-32 (4th ed. 1994). A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. Id. The score is useful in planning treatment and predicting outcomes. Id. The GAF rating is the single value that best reflects the individual's overall functioning at the time of examination. The rating, however, has two components: (1) symptom severity and (2) social and occupational functioning. The GAF is within a particular range if either the symptom severity or the social and occupational level of functioning falls within that range. When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the worse of the two. Thus, a suicidal patient who is gainfully employed would have a GAF rating below 20. A GAF score of 21-30 represents behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment
(continued...)

The administrative record contains a letter from Thomas D. Boyle, Ph.D., dated March 24, 2010, in which Dr. Boyle stated that he had psychotherapy sessions with Sullivan on January 5 and 25, February 20, March 16, May 9, June 7, July 20, September 11, October 9, and December 15, 2006. Tr. 376-377. Dr. Boyle did not submit the actual notes or records of the treatment sessions. In the letter, Dr. Boyle stated that "[i]t was evident that Mr. Sullivan's social skills deficits, secondary to his Asperger Syndrome, were occasionally interfering with his getting along with others socially." Tr. 376. Dr. Boyle further stated that he "tried to impress upon [Sullivan] that he needed to learn how to get along with others, and to not risk losing his job" but that Sullivan "continued to show a tendency to be egocentric in his perceptions, and to blame others, including his supervisor." Tr. 377. After the last session on December 15, 2006, Dr. Boyle did not have further contact with Sullivan. Id.

---

14. (...continued)
or inability to function in almost all areas. A GAF score of 31-40 represents some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. Id. A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. Id. A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. Id. A GAF score of 61 to 70 represents some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well with some meaningful interpersonal relationships. Id.

The next medical records we encounter are from 2008, when Sullivan commenced receiving treatment at WellSpan Behavioral Health, New Freedom, Pennsylvania, from Razvan Vaida, M.D., a psychiatrist. Tr. 290-293. A psychiatric evaluation was performed by Dr. Vaida on January 4, 2008. Id. At that evaluation, Sullivan reported having problems with anxiety and depression and adjusting to changes in his routine. Tr. 290. Sullivan denied irritability but his girlfriend who was present stated that he had some. Id. She also reported verbal outbursts of anger. Sullivan reported that he had suicidal thoughts in November of 2007 when he lost his job but denied more recent suicidal thoughts. Id. Sullivan denied problems with concentration and memory, denied panic attacks or being uncomfortable around people or crowds, and denied difficulty with social interactions. Id. He denied psychotic symptoms, such as paranoid thoughts and auditory or visual hallucinations. Id. At the time of this appointment Sullivan was taking the medications Seroquel and Paxil. Id. A mental status examination revealed that he had no abnormal movements; he engaged the examiner in a friendly manner; his speech was overinclusive in detail; his mood was pretty good; his affect was anxious, intense and energetic; his thought processes were somewhat tangential; he had no suicidal or homicidal ideations or auditory or visual hallucinations; his insight and judgment were good; he was alert to person, place and time; he had

22

a good attention span; he spelled "world" backward correctly; he had a fair fund of knowledge; and he had good memory, including he was able to recall three items immediately and after a few minutes using no hints. Tr. 291-292. Dr. Vaida's assessment was that Sullivan suffered from an anxiety disorder and depression and he could not rule out Asperger syndrome. Tr. 292. Sullivan was given a GAF score of 65, representing mild symptoms. Id. Dr. Vaida continued Sullivan's prescription for Seroquel and Paxil. Id.

Sullivan had appointments with Dr. Vaida on January 9, February 6, June 30, August 1, and October 6, 2008. Tr. 282-289. The notes of the January 9th appointment indicate that Sullivan was suffering from anxiety and Dr. Vaida increased his dosage of Seroquel and Paxil. Tr. 289. The notes of the four other appointments indicate that Sullivan was doing "pretty good" and Dr. Vaida continued to treat Sullivan with Seroquel and Paxil. Tr. 282-288. Dr. Vaida did not record any change in Sullivan's GAF score of 65 which was initially recorded on January 4, 2008. Tr. 282-289.

On November 6, 2008, Dr. Vaida completed a Pennsylvania Department of Public Welfare form on which he indicated in a conclusory fashion that Sullivan was temporarily disabled from any gainful employment for less than 12 months from November 6, 2008, until May 1, 2008, based on a primary diagnosis of Asperger syndrome and secondary diagnosis of anxiety and depression. Tr.

23

366. Dr. Vaida did not specify the degree (whether moderate, marked or extreme) of any work-related mental functional limitations. Id. A similar form was completed by Dr. Vaida on June 26, 2009, in which Dr. Vaida stated that Sullivan was temporarily disabled from June 26, 2009, to January 1, 2010. Tr. 363.

On December 5, 2008, Sullivan had an appointment at WellSpan Behavioral Health with a Bachelor of Science level clinician. Tr. 298-299. The clinician performed a mental status examination which was essentially normal. Tr. 298. Sullivan's mood was normal and his affect was appropriate to mood; he was oriented to person, place and time; his thought processes were organized and coherent; his speech was normal; he had no delusions or hallucinations; his immediate, recent and remote memory were intact; his concentration was intact; his energy was normal; he had no suicidal or homicidal ideations; and his insight and judgment were good to fair. Id. The clinician's diagnostic impression was that Sullivan suffered from anxiety and depression and could not rule out Asperger Syndrome. Tr. 299. The clinician gave Sullivan a current GAF score of 50 and a highest GAF score in the last year of 50 which was contrary to the GAF score assessed by Dr. Vaida on January 4, 2008.

On February 2, 2009, Sullivan had an appointment with Dr. Vaida at which it was noted that Sullivan had no depression,

24

anxiety and irritability;[15] Sullivan had good motivation/sleep; Sullivan was not uncomfortable being around people and crowds; and Sullivan had no psychotic symptoms. Tr. 295-296. Dr. Vaida's diagnostic Axis I impression was that Sullivan suffered from Asperger Syndrome, anxiety and depression and gave Sullivan a GAF score of 70, the high end of the range of 61 to 70 representing some mild symptoms. Tr. 296. Also, of significance is the fact that Dr. Vaida noted his opinion regarding Axis IV which is "for reporting psychosocial and environmental problems that may affect the diagnosis, treatment and prognosis of mental disorders. A psychosocial or environmental problem may be a negative life event, an environmental difficulty or deficiency, a familial or other interpersonal stress, an inadequacy of social support or personal resources, or other problem relating to the context in which a person's difficulties have developed." Diagnostic and Statistical Manual of Mental Disorder, 31 (4th Ed. Text Revision 2000). Dr. Vaida under Axis IV inserted the symbol for "no" or "none." Id.

On February 8, 2009, Sullivan had an appointment with Dallastown Family Medicine and was seen regarding a rash by Troy Jay Hamilton, either a nurse or physician assistant employed by Wayne C. Burgess, M.D. Tr. 353-354. This record is only

---

15.   Dr. Vaida in his notes used the "no or none" symbol, a circle with a diagonal line through it.

25

significant with respect to what it fails to report. When the medical provider reviewed Sullivan's systems, no psychiatric complaints were recorded.[16] Id.

On February 16, 2009, Sullivan had an appointment with Dallastown Family Medicine and was seen regarding a rash by Richard J. Turosinki, M.D. Tr. 350-352. Dr. Turosinki noted that Sullivan was under psychiatric treatment but "his only new medication [is] lorazepam[17] [which] he says he hasn't taken any [] for a month." Tr. 350. When Dr. Turosinki reviewed Sullivan's systems, Sullivan denied any psychiatric problems. Tr. 351. Also, on February 23, August 21, and September 3, 2009, Sullivan had appointments with Dr. Turosinki for various acute physical problems where when Dr. Turosinki reviewed Sullivan's systems, Sullivan denied any psychiatric or emotional problems. Tr. 342-345 and 348-349. On one occasion, August 21, 2009, Dr. Turosinki did note that Sullivan reported depression and anxiety. Tr. 347.

On April 8, 2008, Richard Small, Ph.D., a psychologist, reviewed Sullivan's medical records on behalf of the Bureau of Disability Determination and concluded that he suffered from

16. "The review of systems (or symptoms) is a list of questions, arranged by organ system, designed to uncover dysfunction and disease." A Practical Guide to Clinical Medicine, University of California, School of Medicine, San Diego, http://meded.ucsd.edu/clinicalmed/ros.htm (Last accessed November 6, 2012).

17. Lorazepam is the generic name for Ativan, a medication used to treat anxiety.

Asperger Syndrome, anxiety and depression but that Sullivan's impairments did not meet or equal the criteria of a listed impairment. Tr. 300-316. Dr. Small stated that Sullivan had moderate limitations in social functioning and mild limitations in activities of daily living and maintaining concentrations, persistence and pace. Tr. 313. Dr. Small also indicated that Sullivan was only moderately limited in his ability to interact appropriately with the general public and in his ability to accept instructions and respond appropriately to criticism from supervisors. Tr. 301. Furthermore, Dr. Small stated that Sullivan's anxiety and depression were non-severe and that Sullivan "is able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from his impairment." Tr. 302.

Sullivan had appointments with Dr. Vaida on April 27, August 4, and October 1, 2009, and January 25 and March 11, 2010. Tr. 358-362. The notes of these appointments are difficult to decipher because of the penmanship. However, several notations can be discerned. Dr. Vaida indicated on each occasion with respect to symptoms that Sullivan was doing "pretty good" or "not bad. Id. Dr. Vaida continued to treat Sullivan with Seroquel and Paxil. Id. Dr. Vaida did not record any change in Sullivan's GAF score of 70 which was recorded on February 2, 2009. Id.

On April 4, 2009, it appears that Sullivan had positive anxiety but that he was not uncomfortable around people or crowds. Tr. 362. His judgment, speech and mood were "pretty good." Id.

On August 4, 2009, Sullivan had no "issues/problems" and he had no depression and was looking for a job. Tr. 361. Sullivan had "good motivation/sleep," decreased irritability but some anxiety because of financial problems. Id. Sullivan was dressed casually and moderately obese. Id. He had normal speech, no suicidal/homicidal ideations, no delusions and his judgment and insight were intact. Id.

On October 1, 2009, it was noted that Sullivan had no problems and was attending "OVR"[18] and needed a statement saying he was able to physically and mentally return to work. Tr. 360. Sullivan was dressed casually, moderately obese, and well-kept. Id. Sullivan had a neutral affect, no suicidal or homicidal ideations, no delusions and his judgment and insight were grossly intact. Id. Similar notations and findings were made on January 25 and March 11, 2010. Tr. 358-359.

The record contains several statements from individuals who have had contact with Sullivan over the years. Tabitha Penrod, Sullivan's girlfriend with whom Sullivan lives, submitted a written statement and testified at the administrative hearing.

18. "OVR" is an abbreviation for occupational/vocational rehabilitation or Office of Vocational Rehabilitation.

Also, Tabitha Penrod's mother Diane Penrod and an ex-boyfriend Michael Martin, and Sullivan's parents, Joseph and Camille Sullivan, and sister, Brianna M. Sullivan, submitted statements outlining their observations of Sullivan. Tr. 233-242. A large portion of the information in these statements relate to the difficulty Sullivan faced during his formative years in elementary and secondary school. Id. In a function report completed by Sullivan's mother on March 9, 2009, Sullivan's mother admitted that she does not see Sullivan each day. Tr. 200. The information provided by Ms. Penrod, Ms. Penrod's mother, and Ms. Penrod's ex-boyfriend is of a more recent vintage. Tr. 233 and 240-243. The statements from all of these individuals generally support the finding which is not contested that Sullivan suffers from a severe case of Asperger Syndrome.

The statements of Sullivan's parents and sister set forth observations consistent with the signs and symptoms of Asperger Syndrome. Tr. 234-239.

Tabitha Penrod's statement basically reveals that Sullivan struggles with keeping a daily routine; he often becomes frustrated and agitated about various issues and thinks others are trying to control him; and he is opinionated and argumentative. Tr. 240-241.

Michael Martin reported that he has had contact with Sullivan for 2 ½ years and that Sullivan does not have the ability

29

to perform simple household repairs. Tr. 233. Martin asserts that Sullivan "has very limited ability to follow verbal & written instructions" and that he has to repeat instructions to Sullivan several times. Id. Martin also noted Sullivan's argumentative and opinionated disposition and Sullivan's tendency to perseverate. Id.

Diane Penrod in her statement indicates that she had to deal with Sullivan on several occasions in the last year and half. Tr. 242. She claims that Sullivan has two personalities - an adult personality and a childlike personality. Id. She also mentions his opinionated and argumentative disposition, that he thinks others are trying to control him and that he is unable to perform simple household repairs and chores. Id.

The record also contains a document signed by Sullivan and Tabitha Penrod which appears to indicate that Sullivan borrowed money from Tabitha Penrod and that Sullivan has agreed to pay off the loan once he receives Social Security Disability Benefits. Tr. 341.

**Discussion**

The administrative law judge, at step one of the sequential evaluation process, found that Sullivan has not engaged in substantial gainful work activity since October 2, 2008, the alleged disability onset date. Tr. 20.

At step two of the sequential evaluation process, the administrative law judge found that Sullivan has the following severe impairments: "Asperger's Syndrome; depression; and anxiety." Id.

At step three of the sequential evaluation process, the administrative law judge found that Sullivan's impairments did not individually or in combination meet or equal a listed impairment. Tr. 20-22. At this step the administrative law judge in addressing the listed mental impairments stated that Sullivan had moderate restrictions in activities of daily living, marked difficulties in social functioning, moderate difficulties in concentration, persistence and pace and no repeated episodes of decompensation each of an extended duration. Tr. 22. Consequently, the ALJ found Sullivan did not meet the requirements of any listed mental health condition. Id. In the concluding paragraph of the step 3 analysis the ALJ further indicated that the moderate and marked limitations he identified were not a residual functional capacity assessment but only used to rate the severity of the mental impairment at steps 2 and 3 of the sequential evaluation process. Id. He further noted that steps 4 and 5 require a more detailed assessment and that his ultimate residual functional capacity assessment (elaborated on below) reflects the degree of limitation Sullivan has in the categories

of activities of daily living, social functioning and concentration, persistence and pace. Id.

At step four of the sequential evaluation process, the administrative law judge found that Sullivan can not perform his past relevant work but that he had the residual functional capacity to perform the full range of work at all exertional levels but with several non-exertional limitations. Tr. 22. The non-exertional limitations included impediments in his ability to deal with and be in contact with other individuals (supervisors, co-workers and the public), respond to work-place changes, and set realistic goals or make plans independent of others. Id. The administrative law judge found that Sullivan could occasionally engage in those activities. Id. The ALJ also found that Sullivan could make simple, work-related decisions, maintain a regular schedule and remember, carry out and understand detailed instructions. Id.

In setting this residual functional capacity, the administrative law judge found that Sullivan's medically determinable mental impairments could reasonably be expected to cause his alleged symptoms but that his statements concerning the intensity, persistence and limiting effects of those symptoms were not credible to the extent they were inconsistent with the ability to perform work consistent with the above-stated residual functional capacity. Tr. 23. The administrative law judge also

relied on the opinion of Dr. Small who found that Sullivan had the mental ability to engage in work on a competitive basis and rejected the conclusory opinions of Dr. Vaida set forth on Pennsylvania Department of Public Welfare forms. Tr. 27. The ALJ in rejecting Dr. Vaida's opinion pointed to Dr. Vaida's repeated statements that Sullivan's symptoms were "pretty good" and the high GAF scores, 65 and 70, assessed by Dr. Vaida, representing minor symptomatology. Tr. 24 and 27. The ALJ also considered in detail the statements from Sullivan's friends and relatives and found that although those statements were mostly credible, they were not credible to the extent that they would preclude Sullivan from engaging in a limited range of work as set forth above.

Based on the above residual functional capacity and the testimony of a vocational expert, the administrative law judge at step five of the sequential evaluation process found that Sullivan could perform unskilled, medium work as a janitor; unskilled, light work as bakery worker on a conveyer line; unskilled, sedentary work as a machine tender, semi-conductor bonder; and that there were a significant number of such jobs in the local, regional and national economies. Tr. 28 and 72-75.

Sullivan argues that the administrative law judge erred (1) by not including credibly established limitations in his mental residual functional capacity assessment, (2) by not evaluating properly the statements and testimony of his relatives

and friends, and (3) by not evaluating properly Dr. Vaida's
opinion.

The Court has thoroughly reviewed the record in this
case and finds no merit in Sullivan's arguments. The
administrative law judge did an excellent job of reviewing
Sullivan's vocational history and medical records in his decision.
Tr. 18-29. Furthermore, the brief submitted by the Commissioner
thoroughly reviews the medical and vocational evidence in this
case. Doc. 13, Brief of Defendant.

Initially, it is noted that no treating or examining
physician has indicated that Sullivan suffered from mental
functional limitations that would preclude him from engaging in
the unskilled, sedentary to medium work identified by the
administrative law judge in his decision for the requisite
statutory 12 month period.[19] Furthermore, it cannot be concluded
from the bare medical records that Sullivan is totally disabled
from a mental standpoint. The administrative law judge identified
an unskilled, medium job as a janitor which Sullivan could

_____

19. As stated earlier in this memorandum to receive disability
benefits, the plaintiff must demonstrate an "inability to engage
in any substantial gainful activity by reason of any medically
determinable physical or mental impairment which can be expected
to result in death or which has lasted or can be expected to last
for a continuous period of not less than 12 months." 42 U.S.C. §
432(d)(1)(A) (emphasis added). The two conclusory Department of
Public Welfare forms signed by Dr. Vaida do not cover a
continuous period of 12 months.

34

perform. No physician indicated that Sullivan was incapable of working at that modest level on a full-time basis.

The administrative law judge relied on the opinion of Dr. Small, the state agency physician. The administrative law judge's reliance on that opinion was appropriate. See Chandler v. Commissioner of Soc. Sec., 667 F.3d. 356, 362 (3d Cir. 2011)("Having found that the [state agency physician's] report was properly considered by the ALJ, we readily conclude that the ALJ's decision was supported by substantial evidence[.]").

Sullivan argues that the ALJ did not include in the residual functional capacity the marked limitation in social function and the moderate limitation in concentration, persistence and pace which he found at step three of the sequential evaluation process. However, as noted above the ALJ explained that the marked and moderate limitations were only in conjunction with rating the severity of the mental impairments at steps 2 and 3 of the sequential evaluation process and not a residual functional capacity assessment. In light of that explanation, the Court sees no inconsistency between the marked and moderate limitation at steps 2 and 3 and the ALJ's ultimate residual functional capacity assessment.[20] Moreover, the state agency psychologist, Dr. Small,

_____

20. Assuming for purposes of argument that an error was committed by the ALJ, the Court considers the error harmless in light of the totality of the evidence, including the high GAF
(continued...)

found that Sullivan only had a moderate limitation in social functioning and a mild limitation in maintaining concentration, persistence and pace.

The administrative law judge stated that Sullivan's statements concerning the intensity, persistence and limiting effects of his symptoms were not credible to the extent that they were inconsistent with the ability to perform a limited range of unskilled, sedentary to medium work. There is no basis to question that credibility judgment. The administrative law judge was not required to accept Sullivan's claims regarding his mental limitations. See Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)(providing that credibility determinations as to a claimant's testimony regarding the claimant's limitations are for the administrative law judge to make). It is well-established that "an [administrative law judge's] findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since [the administrative law judge] is charged with the duty of observing a witness's demeanor . . . ." Walters v. Commissioner of Social Sec., 127 f.3d 525, 531 (6ᵗʰ Cir. 1997); see

---

20. (...continued)
scores assessed by Dr. Vaida. See Weary v. Astrue, Civil No. 10-896, slip op. at 40-41 (M.D. Pa. Dec. 15, 2010)(Muir, J.)(applying harmless error analysis); Boyd v. Astrue, Civil No. 11-600, slip op. at 25-26 & 28 (M.D. Pa. May 10, 2012)(Munley, J.).

also Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir. 1991)("We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess the witness credibility."). Because the administrative law judge observed and heard Sullivan testify, the administrative law judge is the one best suited to assess the credibility of Sullivan.

Furthermore, the ALJ adequately reviewed the statements submitted by the friends and relatives of Sullivan. The ALJ appropriately considered those statements in light of the medical records, including the high GAF scores assessed by Dr. Vaida.

The social security regulations specify that the opinion of a treating physician may be accorded controlling weight only when it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case. 20 C.F.R. § 404.1527(d)(2); SSR 96-2p. In this case the ALJ gave an adequate explanation for rejecting the conclusory opinion of Dr. Vaida. The Court will not repeat that explanation other than noting that the administrative law judge pointed out the inconsistency between Dr. Vaida's high GAF scores as well as the mental status finding in the treatment notes and Dr. Vaida's conclusory opinion of disability.

Review of the administrative record reveals that the

decision of the Commissioner is supported by substantial evidence. Therefore, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner will be affirmed.

An appropriate order will be entered.

_____
**United States District Judge**

Dated: September 25, 2013